Atlantic painedと思います Do I have to say what you're pressing on? Sure. I think you're going to have to wait until… I guess so. And they don't care about Kentucky or Tennessee. Case 14-5291, Gregory Burke et al. v. Steve Beshear et al. And case 14-5818, Timothy Love v. Steve Beshear. Oral argument not to exceed 15 minutes per side. Ms. Latherow for the appellants. Good afternoon. Good afternoon, Your Honor. I pledge the court and plaintiff's counsel, Lee Latherow on behalf of the Governor of the Commonwealth of Kentucky. Kentucky has two cases before this court today. The Bork case, which is a marriage recognition case, and the Love case, which is a marriage license case. The district court below granted summary judgment in favor of the plaintiffs in both of the cases. Summary judgment should be reversed for three reasons. First, the court applied an incorrect standard when it applied the rational basis review. It was appropriate to apply a rational basis review, but he applied the wrong test in that standard. Second, the court made it unnecessary, a gratuitous finding, that homosexuals are entitled to a suspect class category as a quasi-suspect class. It was not necessary to his decision to make that ruling, but he did it nonetheless. Third, the court incorrectly concluded that Windsor requires all states to redefine marriage to include same-sex marriage. The Kentucky marriage laws in question are both statutory and constitutional. Nothing changed when these laws were enacted. 1.2 million voters in Kentucky, 74% of those voting on the issue, voted that Kentucky would, like a majority of the states, continue to follow a traditional marriage model. In Kentucky, marriage has been a custom long before the state began issuing marriage licenses. Marriage has always been between a man and a woman. So in this way, Kentucky's laws are very different from what happened in Windsor, and what happened in Romer, and what happened in Lawrence. In Windsor, Section 3 came in and gutted what New York had done in terms of whether the federal government would recognize same-sex marriage for those federal benefits. That isn't what happened at all in Kentucky. Kentucky laws simply kept in place what had always been in place. Likewise in Romer. In Romer, the Colorado Constitution was amended to take away rights and privileges that had been granted to homosexuals. That did not happen in Kentucky. Kentucky has never recognized same-sex marriage. So when the Constitution was amended, when these state statutes were enacted, we did not take away anything that existed previously. Likewise in Lawrence. Lawrence criminalized behavior that before had not been criminalized. So in that regard, Kentucky's laws are very different from what we see in the precedent that is relied upon by the plaintiffs. The district court did not find there to be a fundamental right. What did you just say about Lawrence? You said there were unusual laws. Is that what you said? In Lawrence, it criminalized behavior, actions. And you were saying that was unusual? I'm saying that that was a right to engage in that behavior that was taken away. So before the statutes were enacted to criminalize that behavior, presumably it was not a crime to do it. But what happened in Lawrence is they criminalized that behavior. In other words, they changed what the law was. I guess maybe I'm a little confused by the point you're making, but I thought there was something of an analogy between those laws and this situation, at least in the sense that those laws have been around for a long time. No, you're right. The point was that Kentucky did not take away anything that had been given or take away, change anything when we enacted our laws. It has always been the custom in Kentucky that same-sex marriage has not been recognized. The district court did not find there to be a fundamental right to same-sex marriage. The district court recognized that the plaintiffs were in fact seeking a new right. The district court held that holding that a fundamental right to marry encompasses same-sex marriage would be a dramatic step that the Supreme Court has not indicated a willingness to take. He said that Windsor could have easily addressed that question but did not. So the district court undertook an equal protection analysis and purported to apply a rational basis standard. In doing so, however, the district court adopted a standard that is not a part of the rational basis standard. What the district court looked at was whether Kentucky could show that by denying same-sex marriage it had some impact on the number of marriages that were performed or the number of children who were born, and that's the wrong test to look at. And Judge Niemeyer in the Fourth Circuit Bostick decision, which was issued on July 28th, he addressed this very issue in quoting the Johnson v. Robeson case, says, when the inclusion of one group promotes a legitimate governmental purpose and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and non-beneficiaries is invidiously discriminatory. Judge Haber did not apply that standard in this case. In the Maxwell's pickpack case, which was decided by this court in April of this year, the court said that the equal protection clause is not a license for the courts to judge the wisdom or fairness or the logic of legislative choices. The court, citing FCC v. Beach Communications, said that in areas of social and economic policy, a statutory classification that does not proceed along suspect lines or infringe on constitutional rights must be upheld against the equal protection challenge if there is any conceivable state of facts that would provide a rational basis for the classification. That's a very differential standard that Judge Haber did not apply in this case. The district court really did an about-face when he looked at the issue of whether homosexuals are entitled to a suspect or were there a suspect class in Kentucky. In his Bork decision, he held that he was limited by the Davis decision from addressing that issue. He said that it had been resolved within the Sixth Circuit and he was without authority to decide it, citing the Darrell case. Five months later, when he decided the Love case, he went ahead and decided it without any en banc decision from the Sixth Circuit, without any intervening Supreme Court decision within those five months. It was a gratuitous decision. It certainly was not necessary to his decision because he decided it on a rational basis. The district court also erred because the district court concluded that Windsor compelled a determination that Kentucky's marriage statutes were unconstitutional. Windsor says in the concluding paragraph of the majority, this opinion and its holdings are confined to those lawful marriages, meaning those lawful marriages under review in New York. New York decided, based upon the discrete decision of the communities, is the language that Justice Kennedy uses, that that is what the citizens of those communities decided. And it's not the place of the federal government to come in and take those rights away. Plaintiffs are asking this court to do what the Supreme Court said that cannot be done in Windsor. That is, the Supreme Court, or the federal government, should not interfere with the traditional and historic authority to define marriage, a right that is left to the states. Your Honor, we would agree that Baker v. Nelson remains controlling and is binding upon this court. It was a summary dismissal and a disposition that was made on the merits. We've talked a lot today about the Lawrence case and what meaning that case has in Justice O'Connor's concurrence in that decision. She says that Texas cannot assert any legitimate state interest here, such as preserving the traditional institution of marriage. Unlike the moral disapproval of same-sex relations, the asserted state interest in this case, other reasons exist to promote the institution of marriage beyond mere disapproval of an excluded group. That's a helpful opinion, but it's one person, and it's a person no longer on the court. It is, Your Honor. It's still instructive that Lawrence does not necessarily decide the issue that is before the court today, that it is not this doctrinal development that has somehow overruled Baker v. Nelson or compels this court to take the decision away from the voters of the states. This court cannot resolve the polarizing social policy that's to be made in the same-sex marriage debate. The court can and should decide the legal issue of who gets to resolve this debate. The people of Kentucky Assuming rational basis applies for a moment, what are Kentucky's theories as to why there's a rational basis here? Kentucky has asserted the procreation interest in that Skinner says that marriage and procreation are essential to the very survival of the human race, and Kentucky has asserted that interest in that procreation is enough. As an extension of that argument, Kentucky has said that perpetuation of the human race leads to stable birth rates, which in turn leads to a strong economy. So that is the interest that it has asserted. What we saw in Skinner says it is very necessary to the survival of the race. The Supreme Court has also said that people have a right not to procreate. Griswold. Yes, Your Honor. Oh, I'm just pointing that out. Do you have any response to that? I mean, marriage doesn't mean you have to procreate. There is a right not to procreate. There is a right not to procreate, Your Honor. The question is, when you're looking at a governmental benefit, which marriage is, a marriage license is, and you're looking under the rational basis test, does the group who gets the benefit, and here traditional man-woman couples get the benefit, does that benefit further the state interest? And it does further the state interest. Can you tell me how, though? You know, we're back to the old, what is it about same-sex marriage that will stop procreation in the state of Kentucky? Well, Your Honor, that isn't the standard. And that's exactly what Judge Haber applied and what Judge Niemeyer said in his dissent and what the Supreme Court said in Johnson v. Roe. What is the connection? If that's not the connection, what is the connection? The connection between marriage is procreation, just like the Supreme Court said in Skinner, that marriage and procreation are vital to the very existence of the human race. All right. So, Your Honor, we ask that the Court allow this issue to be resolved through the political and democratic process so that all Kentuckians may have a say in the issue. We ask that the district court's decision be reversed. Okay. Thank you, Ms. Latherow. Ms. Landewich. May it please the Court, Laura Landewich on behalf of the appellees. Kentucky's laws place a badge of inferiority on people and families, and it invades the sphere of individual rights protected by the Constitution. In rejecting this intrusion, Judge Haber found that the Commonwealth's justifications for the marriage ban are not the arguments of serious people. Indeed, it is inconceivable, bewildering according to the district court, that a single Kentucky voter cast his or her ballot in 2004 with the expectation that heterosexual couples would in response copulate and produce offspring. Windsor discusses the burden that this second-class status has from the mundane to the profound. And I want to start today with talking about this justification that Kentucky has asserted. The Fourth Circuit in Bostick recently rejected a very similar argument to the one that Kentucky puts forth today. And it found that the law was so under-inclusive because it included so many infertile couples, so many women over the age of childbearing years that were still permitted to participate in the marital institution. How do you respond to the Mergia case? I mean, if we assume rational basis applies for a second, you know, Mergia's got a very serious under-inclusiveness problem, right? You've got these 50-year-old police officers that are more fit than 40-year-olds, but they're forced to retire. And so isn't that an appropriate analogy to the problem that you can have gay couples who are just as loving and affectionate, just as committed, just as good at parenting, just as good in every way, maybe better? Well, there are two distinctions here. The first is that, as the Tenth Circuit in Kitchen pointed out, the mismatch here is not just at the margins of the right. I mean, we have a huge mismatch between those that are excluded ostensibly because they don't procreate so-called naturally and those that are included in the benefit. Whereas in the case with age of the police officers, you're talking about a gray area at the margins of the right. And furthermore, even if we are using rational... Are there a lot of 50-year-olds that are plenty capable of being great police officers? Certainly there are. But the other distinction between that case is that it did not involve a fundamental right. It did not create two classes based upon one... Well, I mean, emergia doesn't help if you're in heightened review. I agree with that. That's true. Right, and where we are is that we are certainly at some level of heightened review, even if we look at the sort of amorphous standard that has been applied throughout the cases involving gay and lesbian rights. Even if we look there, the standard is not one that is so deferential that the court will just allow any ad hoc justification to suffice. The court has applied a searching standard when it looks at what the purpose of the laws is. And in Windsor, the court looked, as in Romer, at the actual purpose of the laws. And when we come here... And I want to just address Judge Sutton's previous discussion about animus and the role that animus plays. And the court should be clear that animus, in a constitutional sense, does not mean bigotry or outright prejudice. It can mean thoughtlessness, insensitivity, or a failure to appreciate the full humanity of those who seem different. Or if we look at some of the other... The plaintiffs in these cases are relying on loving, a case about white supremacy. Well, loving... Isn't that animus in the regular bigoted sense? Well, certainly, I think in loving it was. But loving also involves many of the same arguments that have been asserted by the states in these cases. Among them is procreation. I mean, the state asserted in loving that it had a concern with what the trial judge called the potential effects of creating a mongrel race. That was the state inserting itself into some concern about how and whether and who people procreate with. And the state here is making a similar justification. Yeah, I don't know. I mean, what seems very different to me in where the word animus, whether in a constitutional sense or a regular sense, doesn't make sense to me is when you're talking about people, for better or worse, deciding to preserve an institution the way it was for just centuries. That's just hard to think of in an animus way. I think of people who do that as risk-averse, Burkean. They want their change a little more slowly. But to call it animus just seems really funny to me. Well, you know, another way that we can reach animus is like the court did in Romer, which is if there is no rational basis, if there is no nexus between the purpose and the effect of the law. You don't need animus. If there's no rational basis, you win. Animus is not relevant if you satisfy the normal rational basis test, don't you think? Certainly, certainly. We do not need animus at all in order to reach the conclusions in this case. I just want the court to be aware that we're not necessarily talking about bigotry or the type of bigotry that necessarily was in play in Loving. What we are talking about here is a desire to create two separate classes of marriage within the state of Kentucky, two classes of intimate family relationships, one that is preferred and the other that is disfavored. When we speak about the retention of the traditional and you say there's an intention to create two classes, it doesn't have to be, that's a result, I suppose, more than an intention. Would you agree? You want to suggest the result is preordained by virtue of the law, but if we're talking about animus, it doesn't sound like it's an intention. We'd be going back to having people of ill will looking for that. We don't have to look necessarily at the purpose. We don't have to go there. Although I don't think it necessarily has to involve ill will, we still have the effect of creating two classes. And that's what bothered the court in Windsor under an equal protection analysis was that you have these families, you have families and familiar relationships that are protected by the Constitution and, among other ways, through the right of privacy, and the state is coming and declaring one class of those people superior to the other. And there's this line in Windsor where Justice Kennedy says, New York, without doubt, that's the quote, had the right to recognize same-sex marriages and treat them with equal dignity, other marriages. Doesn't the without doubt language imply the opposite? I mean, they have the right to recognize it, they have the right not to recognize it. I don't think that that language necessarily implies that it had the right not to recognize. That issue wasn't before the court. What Justice Kennedy affirmed was that really, same-sex couples are included in what we are thinking of when we talk about marriage. In New York, there was certainly the right of the state to extend that benefit and that designation to these individuals. And I don't think that it can be read into Justice Kennedy's language there that the converse was true. When we talk about federalism, which I know Judge Sutton has expressed some concerns over, it should be pointed out that those arguments were raised in the Fourth Circuit and the Tenth Circuit, and they were rejected. They were also raised in Loving, and the court rejected them there. There is a limit on the democratic process. Aren't we cabined a little more in our circuit on the heightened review point? I'm sorry, I didn't catch the first part. Aren't we in the Sixth Circuit cabined a little more, restricted a little more, given our precedent saying that sexual orientation is not a suspect classification and not providing heightened review? The point I'm making is I'm responding to your reliance on the Tenth and Fourth Circuit cases, and I'm just wondering if that's a difference that would distinguish those two cases. Well, in the Fourth and Tenth Circuit, the ruling was on due process grounds. They found that there was a fundamental right to marry that included same-sex couples. But if Your Honor is referring to the Davis decision and the Equality Foundation and what Judge Habern did in applying the four considerations from Cleburne to qualify gays and lesbians as a quasi-suspect class, I don't think that this court is bound by what happened in Equality Foundation and its progeny for reasons that have already been discussed, primarily that Equality Foundation was based upon Bowers, which has been expressly overruled.  This court did not need to reach whether or not there was a quasi-suspect classification involved. And it did, I think as Judge Daughtry pointed out earlier, sort of take it for granted because it was not necessary to the conclusion. So I don't think that either of those cases prevent this court from, for the first time, applying the four factors as Judge Habern did below and making a determination as to whether there is some suspectness that requires heightened scrutiny. Going back to the federalism argument, the states can regulate in a lot of ways. And they are limited, as has been repeatedly emphasized by the Supreme Court, even as recently as in Schuette, that once those regulations start to impinge upon that area of fundamental right, that we have to, the court's role is to take a look and step in. And the purpose of the Bill of Rights is to protect the minority from the will of the majority in our otherwise democratic society. In Schuette, Judge Justice Kennedy said, the individual liberty that is protected, the full extent and meaning of it, may yet remain to be discovered and affirmed. And I think that this court should read that language in conjunction with Windsor as recognizing what the Tenth Circuit and the Fourth Circuit has recognized, that the fundamental right to marry has not changed. What has changed is our understanding of what it means to be gay and lesbian. And now we must recognize that these individuals are entitled to the equal protection of the law, and they are also entitled to exercise their fundamental right. In his dissent in Windsor, Justice Scalia noted that the implications of Windsor are unmistakable. Beginning with Loving and continuing through Lawrence and Windsor, the path to marriage equality has been laid, and we now ask this court to walk down it. Thank you. Thank you very much, Ms. Landewich. Ms. Lotherow, I think you have a few minutes for rebuttal here. Your Honor, briefly, to address the harm issue, Romer said that even if a law works to the disadvantage of a particular group, it will be sustained if it can be said to advance a legitimate government interest. Kentucky's laws do advance a legitimate government interest. Windsor recognized that the states have a historic and essential authority to define marriage. The voters of Kentucky did exactly that and exercised their historic and essential authority. The voters of Kentucky may vote someday, pursuant to that historic authority, to change the definition of marriage, just as New York did in Windsor. But whether and when to do that should be the right of Kentuckians to decide. Therefore, we ask that the decisions of the district court, which remove that authority from Kentuckians, be set aside. I hate to keep coming back to this, but I'm really trying to get something substantive here. How does that Kentucky law advance a state interest? How does it do it? What is the mechanism? The state interest is in procreation, and we believe that couples who are married procreate. It's really very basic. Well, couples who aren't married, in fact, procreate, too. They do. And more and more couples these days are not getting married, and they're procreating. They do. There's no question about that. So how does the law advance procreation? We believe that in the confines of marriage that procreation occurs. Just as it does outside. It doesn't mean that it doesn't happen outside. The law doesn't have to be drawn with mathematical certainties. Okay. So I can put this down that what the Kentucky law does is cause procreation? It furthers the interest in procreation. Yes, Your Honor. Just as in Skinner. Okay. Wait, wait, wait. But I think we're getting circular now. How does it foster procreation? And you're telling me it does so because married people procreate. That's correct. Is that what you said? Same-sex couples, biology, same-sex couples cannot procreate. They can perhaps do artificial insemination. They can perhaps have a surrogate. But that's not a procreation of that couple. Married couples can procreate, and we believe they do procreate. And that is the interest that is advanced. By definition, same-sex couples cannot procreate. Married opposite-sex couples procreate. Yes, Your Honor. Okay. Got it. Thank you. They're incapable of procreating, and that advances the legitimate interest of the Commonwealth. Okay. That's all I have, Your Honor. Thank you. Okay. Thank you, Ms. Latherow. Thank you to both of you for your helpful briefs and oral arguments. That case will be submitted, and we're ready for the last case.